UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| HOPE OF KENTUCKY, LLC, *et al.* | ) ) | Civil No. 3:22-cv-00062-GFVT |
| Plaintiffs, | ) ) ) | |
| V. | ) ) ) | **OPINION** |
| | ) | **&** |
| DANIEL CAMERON, *in his official Capacity as Attorney General of Kentucky*, | ) ) ) ) | **ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

"This is a case about nothing."[1]  After Kentucky's Attorney General issued civil investigative demands to six banks, Hope of Kentucky, LLC, and the Kentucky Bankers Association cried foul.  They claim that Attorney General Daniel Cameron's investigation into the banks' green energy investing violates Kentucky law and their First Amendment rights.  But Attorney General Cameron did not issue any of the demands to the associations or their members.  Nor has he given any indication that he might do so.  Because the Plaintiffs cannot show that they are injured by Attorney General Cameron's investigation, they lack standing for their First Amendment claim, and the Court must dismiss it for lack of jurisdiction.  For this reason, the Court cannot exercise supplemental jurisdiction over their two remaining state law claims.  Attorney General Cameron's Motion to Dismiss **[R. 7]** will be **GRANTED** in part, and the case will be **REMANDED** to state court for further proceedings.

---

[1] *Morrison v. Bd. of Educ.*, 521 F.3d 602, 604 (6th Cir. 2008) (quoting *Husain v. Springer*, 494 F.3d 108, 136 (2d Cir. 2007)).

**I**

The Kentucky Bankers Association is a Kentucky nonprofit corporation whose membership includes approximately one-hundred-fifty national and local banks. [R. 1-1 at 2.] It promotes the general welfare of banking in the Commonwealth and fosters connections among its members. *Id.* at 3. Through its charitable work, the Bankers Association has contributed to relief funds for natural disasters such as Hurricane Katrina, the December 2021 tornadoes in Western Kentucky, and the July 2022 flooding in Eastern Kentucky. *Id.*

Hope of Kentucky is a subsidiary of the Bankers Association that pools money from over sixty financial institutions to fund multifamily housing projects. *Id.* at 1–2. The organization seeks to alleviate supply side pressure on the low-income rental housing market by supporting the creation of additional affordable housing units. *Id.* at 2. Hope has contributed to more than three-hundred-million dollars in financing to build over three-thousand affordable housing units. *Id.*

On October 19, 2022, Daniel Cameron, the attorney general for the Commonwealth of Kentucky, issued six Subpoena and Civil Investigative Demands to national banks. *Id.* at 5. Attorney General Cameron addressed the Demands to Bank of America, Citigroup, Goldman Sachs, JP Morgan Chase, Morgan Stanley, and Wells Fargo. *Id.* The same day, Mr. Cameron issued a press release and announced that he joined a Missouri-led investigation into potential antitrust and consumer protection law violations stemming from the banks' "ESG (environmental, social, governance) investment practices." [R. 1-1 at 96.]

As members of the United Nations' Net-Zero Banking Alliance, the banks established carbon emissions reduction targets in their lending and investment portfolios designed to help eliminate global carbon emissions by 2050. *Id.* Mr. Cameron suspected that this strategy

could violate Kentucky consumer protection statutes and antitrust law by discriminating against businesses that do not align with a net-zero carbon agenda. *Id.* Accordingly, he demanded information such as the banks' affiliated businesses that participate in ESG investing, the entities to which the banks provide banking services in the energy sector, and any agreements with other financial institutions to coordinate their actions to achieve net-zero investing targets. *Id.* at 89–90.

The Bankers Association and Hope sued Mr. Cameron in Franklin Circuit Court, alleging that he acted in excess of his authority under Kentucky law and that he violated their rights under the First Amendment to the United States Constitution. [R. 1-1 at 8, 10.] Mr. Cameron removed the case to federal court, and a torrent of filing ensued. [R. 1.] The Bankers Association and Hope believe that the case belongs in state court and seek remand and abstention. [R. 6.] Mr. Cameron believes that the Court should dismiss all the claims. [R. 7.] The matter is now ripe for review.

## II

First, the Court, as it must, considers its jurisdiction to hear this case. Attorney General Cameron argues that the Court's potential jurisdiction stems from the Bankers Association and Hope's claim that arises under the First Amendment to the United States Constitution. [R. 1 at 1–2.] As the Plaintiffs point out, that means that the Court's authority over the state law claims is based in its supplemental jurisdiction.[2] [R. 13 at 4.]

---

[2] The other possibility would be that the Court can exercise jurisdiction over the state law claims by virtue of diversity of citizenship among the parties. 28 U.S.C. § 1332. A federal court can only exercise jurisdiction under Section 1332 if no plaintiff and no defendant are citizens of the same state. *Jerome-Duncan, Inc. v. Auto-By-Tel, L.L.C.*, 176 F.3d 904, 907 (6th Cir. 1999). As entities incorporated under Kentucky law, the Bankers Association and Hope are citizens of Kentucky. [R. 1-1 at 1, 2]; 28 U.S.C. § 1332(c)(1). Attorney General Cameron's citizenship is less clear. Many courts hold that state officials, sued in their official capacities, are not "citizens" at all for the purposes of Section 1332. *E.g.*, *Rose Acre Farms, Inc., v. N.C. Dep't of Env't & Nat. Res.*, 131 F. Supp. 3d 496, 501 (E.D.N.C. 2015) ("[S]tate officials sued in their official capacities are . . . the alter ego of the state and are not considered citizens for diversity purposes."). Others hold that Government officials sued in their official

Attorney General Cameron urges the Court to dismiss this case because the Plaintiffs lack standing. [R. 7 at 1.] He suggests that, because the CIDs are not directed to the Bankers Association, Hope, or any of their members, they do not have standing for their First Amendment claim. *Id.* at 18. He also contends that the Plaintiffs lack standing to pursue their state law claims, either under the relevant statutes, as taxpayers, or as representatives of their members. *Id.* at 5–7. The Court can only consider the state law claims if it has jurisdiction over the federal claim. *See Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996). Accordingly, the Court turns first to the issue of standing under the First Amendment.

A

The Bankers Association and Hope lack standing to bring their federal claims. The First Amendment prevents the Government from "abridging the freedom of speech . . . ." U.S. Const. amend. I. It also implicitly protects "a corresponding right to associate with others." *Ams. For Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). The Bankers Association and Hope claim that Mr. Cameron has violated both rights. [R. 1-1 at 10.] Mr. Cameron argues that the organizations cannot demonstrate an injury under the First Amendment because the CIDs at issue are not directed toward them or their members. [R. 7 at 18; R. 16 at 2.] He invokes the doctrine of standing. *Id.*

Federal courts only have the power to hear "cases and controversies." U.S. Const. art. III § 2; *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is the "irreducible constitutional minimum" required for a Court to consider a dispute. *Lujan*, 504 U.S. at 560. Generally, to have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly

---

capacities are citizens of the place of their office. *E.g., T M Systems, Inc. v. United States*, 473 F. Supp. 481, 486 (D. Conn. 1979) (a contracting officer for the FAA was a citizen of the District Columbia). Regardless, the result is the same. There can be no diversity jurisdiction in this case because, even if Attorney General Cameron is a citizen of somewhere, he is a citizen of Kentucky.

4

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial opinion." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Absent the kind of injury sufficient to confer standing, a party does not have an adequate stake in the outcome of the litigation to make it a "case or controversy." *See Baker v. Carr*, 369 U.S. 186, 204 (1962).

To suffer an injury in fact, "the plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). To be particularized, the injury must affect the plaintiff in a distinct, personal, and individual way. *Id.* A concrete injury is one that is "*de facto*," meaning that "it must actually exist" and is not "abstract." *Id.* at 340.

The injury requirement cabins the federal courts' power. *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1177 (D.C. Cir. 1982) (Bork, J., concurring) ("[I]njury in fact, far from being a simple, descriptive term, is a concept freighted with policies that limit the kinds of injury courts may consider."). Both its constitutional and prudential elements are "founded in concern about the proper—and properly limited—role of the court in a democratic society." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Hewing close to "cases of a form historically viewed as capable of judicial resolution" affirms the democratic value of separation of powers by avoiding the expansion of judicial power. *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 101 (1968)). After all, deciding a matter in which the plaintiff has no standing would result in the court "decid[ing] abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions." *Warth*, 422 U.S. at 500. Though courts may be tempted to relax standing requirements to reach the merits of a particular issue, avoiding that temptation is an important exercise of judicial restraint which maintains the separation of

5

powers. *Kentucky v. EPA*, No. 3:23-cv-00007-GFVT, 2023 U.S. Dist. LEXIS 56355, *11–12 (E.D. Ky. Mar. 31, 2023).  The plaintiff bears the burden of establishing standing.  *Lujan*, 504 U.S. at 561.

**B**

In response to Mr. Cameron, the Bankers Association and Hope suggest several theories that they have suffered a cognizable injury under the First Amendment.  [R. 13.]  Foremost, the Bankers Association argues that the very existence of the CIDs inhibits its ability to freely discuss environmentally responsible investment practices.  *Id.* at 8.  The Bankers Association also argues that it has associational standing to challenge, in advance, any potential CIDs issued to any of its members.  *Id.* at 8.  Finally, Hope believes that the CIDs have harmed it by reducing the amount of financing available in the market for its projects.  *Id.* at 14.

**1**

The Bankers Association claims to have direct standing because Mr. Cameron's investigation makes it hesitant to discuss environmentally responsible investing and to associate with other likeminded bankers.  [R. 13 at 9.]  Based on its charitable endeavors in response to natural disasters, the Bankers Association claims that it wishes to discuss ESG investing without fear of Government investigation.  *Id.*  The breadth of Mr. Cameron's CIDs concerns the Bankers Association, particularly the scope of demands that the target banks disclose information on their "political projections" and "trade association activities" with banking service clients.  *Id.* (quoting [R. 1-1 at 10–11]).  They believe that the CIDs impose an ongoing obligation for the target banks to disclose information regarding "the persons [with whom] a recipient is interacting."  *Id.* at 10.  Accordingly, they argue that the CIDs are an albatross looming over them, chilling their right to speak about green energy investing.  *Id.*

Mr. Cameron disagrees and argues that concerns about chilled speech, without more, are insufficient to demonstrate standing. [R. 16 at 2.] The CIDs do not target the Banking Association. [R. 7 at 18; R. 16 at 2.] So, the Attorney General claims that he has not injured the Plaintiffs.

Mr. Cameron is correct if his actions only subjectively chill these Plaintiffs' speech. Under longstanding precedent, a litigant alleging subjective chill must show that enforcement of the challenged action against him has either occurred or is imminent. *See Morrison v. Bd. of Educ.*, 521 F.3d 602, 610 (6th Cir. 2008). But, if the Plaintiffs can show that the CIDs objectively chill speech, they have standing even in the absence of a credible threat of enforcement. *See Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019).

Government action that has an indirect effect on the exercise of First Amendment rights can be challenged. *Laird v. Tatum*, 408 U.S. 1, 12–13 (1972). Traditionally, to do so, a plaintiff must show that he has sustained or is in imminent danger of sustaining an injury to invoke the judicial power to hear the case. *Id.* The very existence of a government investigation, even if the plaintiff perceives it to be inappropriate, does not create such an injury. *Id.* at 13. These sort of allegations, referred to as subjective chill, "are not an adequate substitute of specific present objective harm or a threat of future harm." *Id.* at 13–14. More is required. *Morrison*, 521 F.3d at 609.

"[S]ubjective chill requires some specific action on the part of the defendant in order for the litigant to demonstrate an injury-in-fact." *Id.* "Conversely, absent proof of a concrete harm, where a First Amendment plaintiff only alleges inhibition of speech, the federal courts routinely hold that no standing exists." *Id.* "In order to have standing, . . . a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is

imminent." *Id.* at 610 (citing *Am. Libr. Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992)). "[W]hether the plaintiffs have standing . . . depends on how likely it is that the government will attempt to use these provisions against them . . . and not on how much the prospect of enforcement worries them." *Barr*, 956 F.2d at 1193. "Governmental activity constitutes an injury-in-fact when the challenged exercise of governmental power [is] regulatory, proscriptive, or compulsory in nature, and the complainant [is] either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging." *Schlissel*, 939 F.3d at 765.

Conversely, the Courts of Appeal have begun to develop a doctrine under which a plaintiff can show a cognizable injury independent of Government enforcement. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). These cases rely on the danger of self-censorship to find injury. *Id.* The fundamental question in these cases is whether Government policy objectively chills protected expression. *Id.* As the Sixth Circuit has more abstrusely put it, "[w]e use the term 'objective chill' to refer to laws or regulations that produce direct injuries and the term 'subjective chill' where a law or regulation does not." *Schlissel*, 939 F.3d at 764.

A close evaluation of two cases from the Sixth Circuit is instructive. *Compare Morrison.*, 521 F.3d at 608–10 *with Schlissel*, 939 F.3d at 765–67. In both, a school implemented a policy to prevent harassment and bullying of certain classes of people.[3] Both plaintiffs were students who had not yet been subjected to discipline or investigation under the

---

[3] *Morrison*, 521 F.3d at 607 (high school policy prohibiting "unlawful behavior based on race, color, national origin, age, religion, sex[,] actual or perceived sexual orientation or gender identity, or disability . . . ."); *Schlissel*, 939 F.3d at 762 (University policy designed to respond to "conduct that discriminates, stereotypes, excludes, harasses or harms anyone in our community based on their identity (such as race, color, ethnicity, national origin, sex, gender identity or expression, sexual orientation, disability, age, or religion).").

policy.[4]  Indeed, the only alleged harm in each case was the plaintiff's decision to self-censor.[5] Yet the Sixth Circuit found standing in *Schlissel* but not in *Morrison*.[6]

The difference in the two cases comes down to the consequences available if the plaintiff had exercised his right to speak.  The key fact in *Schlissel* was that the University of Michigan could refer a student to the police if he failed to voluntarily participate in its program.  *Schlissel*, 939 F.3d at 762–63, 765; *See also Speech First, Inc. v. Fenves*, 979 F.3d 319, 333 (5th Cir. 2020) (interpreting *Schlissel*); *Speech First, Inc. v. Killeen*, 968 F.3d 628, 643 (7th Cir. 2020) (same). As one court puts it, the fundamental question under the objective chill line of cases is "whether the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor."  *Cartwright*, 32 F.4th at 1120 (internal citations and quotations omitted).

The Bankers Association and Hope's ability to demonstrate standing under their chill theory depends on whether they can allege objective or subjective chill.  They cannot show standing for a subjective chill claim because there is no evidence that Mr. Cameron has taken any steps to investigate them or their members.  *Morrison*, 521 F.3d at 609.  And they do not qualify for an objective chill claim for several reasons.

The Sixth Circuit holds that objective chill claims are not available to plaintiffs that bring as-applied, pre-enforcement challenges.  *Schlissel*, 939 F.3d at 766.  Facial challenges to a law's

---

[4] *Morrison*, 521 F.3d at 610 ("The record is silent as to whether the school district threatened to punish or would have punished Morrison for protected speech in violation of its policy."); *Schlissel*, 939 F.3d at 771 (White, J., dissenting) ("There is no evidence in the record that any of the anonymous students have had any interaction with the Response Team, that any outreach is imminent, or that any such outreach would result in any 'concrete harm.'").

[5] *Morrison*, 521 F.3d at 610 ("The claim at stake here involves Morrison's choice to chill his own speech based on his perception that he would be disciplined for speaking."); *Schlissel*, 939 F.3d at 766 ("The lack of discipline against students could just as well indicate that speech has already been chilled.").

[6] *Morrison*, 521 F.3d at 610 ("Absent a concrete act on the part of the Board, Morrison's allegations fall squarely within the ambit of 'subjective chill' that the Supreme Court definitively rejected for standing purposes."); *Schlissel*, 939 F.3d at 766 ("Students who violate the Statement are subject to a range of consequences, including expulsion.").

9

constitutionality seek to eliminate the law entirely, invalidating it in all its applications. *Speet v. Schuette*, 726 F.3d 867, 871 (6th Cir. 2013). By contrast, an as-applied challenge simply argues that the manner of enforcement of a law against a given plaintiff violates the constitution. *Id.* at 872. As-applied claims only seek to invalidate the law in a discrete setting. *Id.* Sustaining a facial attack is more difficult for a plaintiff than bringing an as-applied challenge. *See id*; *see also Ams. For Prosperity Found.*, 141 S. Ct. at 2387.

Mr. Cameron argues that this case presents both a facial and an as-applied challenge to his CIDs. [R. 7 at 18.] But treating a challenge to an investigative tool, the CIDs, rather than an attack on the law that they are intended to enforce, Kentucky's consumer protection statute, as a facial challenge would be a strange interpretation. Typically, a facial challenge would focus on the statute or policy subject to enforcement. *E.g., Fischer v. Thomas*, 52 F.4th 303, 306 (6th Cir. 2022) (facial challenge to Rules of the Kentucky Code of Judicial Conduct). The Plaintiffs have not challenged the constitutionality of the consumer protection statute in all its applications. *C.f. Speet*, 726 F.3d at 871. Instead, they are focused on the effects of the CIDs on themselves and their member banks. [*See* R. 1-1 at 11 ("The very existence of the CIDs . . . chills *the Plaintiffs' rights to think, speak[,] and associate freely . . . .*") (emphasis added).] This claim, like other challenges to a CID, is an as-applied challenge. *See Online Merchs. Guild v. Cameron*, 995 F.3d 540, 544 (6th Cir. 2021) (treating challenge to CIDs issued under Kentucky's anti-price-gouging laws as an as-applied challenge).

For this reason alone, the Bankers Association and Hope's argument that they have standing based on a chilling effect is suspect. Mr. Cameron has not taken any action against them or their members. Accordingly, this is a case "like *Morrison*, where . . . it only makes

sense to require 'some specific action on the part of the defendant in order for the litigant to demonstrate injury-in-fact.'" *Schlissel*, 939 F.3d at 766.

Moreover, a reasonable would-be speaker would not be chilled by Mr. Cameron's investigation. Mr. Cameron is not investigating green energy investing broadly. Rather, he is confirming that existing trade agreements to commit to environmentally responsible investing do not violate antitrust and consumer protection laws. [R. 16 at 4–5.] If the Bankers Association and Hope wish to discuss carbon neutral investing in a manner that does not violate these laws, they should have little to fear. *See FTC v. Superior Court Trial Laws. Ass'n*, 493 U.S. 411, 431–32 (1990) (holding that the First Amendment did not preclude application of antitrust laws to illegal, economic behavior that had an expressive component); *see also Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697 (1978) (explaining that the "First Amendment does not 'make it . . . impossible ever to enforce laws against agreements in restraint of trade . . . .'" (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949))).

Ultimately, this case is extremely similar to the Supreme Court's decision in *Laird v. Tatum*. The Army gathered a massive amount of data regarding individuals that it viewed as a threat to civil unrest. *Laird*, 408 U.S. at 6. The data included associational information such as names of organizations, the identities of speakers, and the number of persons who attended rallies. *Id.* Displeased with this policy from the executive branch, citizens sued and claimed that their mere awareness of the investigation dissuaded them from exercising their First Amendment rights. *Id.* at 11. The Supreme Court rejected their claim "that the very existence of the Army's data-gathering system produces a constitutionally impermissible chilling effect upon the exercise of their First Amendment rights." *Id.* at 13. Their "speculative apprehensiveness that the Army

11

may at some future date misuse the information" amounted only to "subjective 'chill'" and was not a "substitute for a claim of specific present objective harm . . . ." *Id.* at 13–14.

The Bankers Association offers the same speculative claim. It disagrees with the AG's investigation. And it clearly feels that the investigation violates someone's First Amendment rights. The trouble is, they cannot show a connection to their own right to free speech or association. Without more, their claim is purely speculative, amounting only to subjective chill.

**2**

The Bankers Association also posits that it has standing on behalf of its members. An organization must either establish standing on its own behalf due to a palpable injury resulting from the defendant's actions or standing as the representative of its members. *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002). An entity can sue for an injury suffered by its members if: (1) its members would have standing on their own, (2) its interest in the suit is germane to its purpose, and (3) neither the claim nor the requested relief requires the participation of individual members.[7] *Ass'n of Am. Phys. & Surgeons v. FDA*, 13 F.4th 531, 538 (6th Cir. 2021). Because this case involves government investigation rather than prosecution, it implicates the rules for pre-enforcement challenges. *Online Merchs.*, 995 F.3d at 549. Therefore, the Banker's Association must show (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute" and (2) "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S.

---

[7] The Sixth Circuit cast serious doubt on this test in *AAPS*. 13 F.4th at 538-42. It observed that the associational standing test is "not obviously reconcilable" with the Supreme Court's guidance on which standing elements are "prudential" and which are constitutional. *Id*. Nevertheless, it followed guidance to "stick to . . . directly on-point precedent even if the logic from other cases has called that precedent into doubt." *Id*. at 542. The Circuit still applied this test because it is "directly on-point precedent" from the Supreme Court. *Id.* So too will this Court.

149, 159 (2014). Even assuming that the Bankers Association can satisfy the first prong of this test, they cannot show a credible threat of prosecution.

Unlike a recent case involving a CID issued by Mr. Cameron, the Plaintiffs have not alleged that any of their members have received a subpoena or a CID in this investigation. *C.f. Online Merchs.*, 995 F.3d at 549 (one member received a CID). Instead, they argue that "the KBA's members risk receiving a CIDs [sic] like the ones issued on October 19, 2022 . . . ." [R. 13 at 12.]

Courts assess whether a credible threat of prosecution exists based on a non-exhaustive list of factors, including (1) the history of enforcement against the plaintiffs or others, (2) the existence of enforcement warning letters, (3) any attribute of the challenged statute that makes enforcement easier, and (4) the defendant's refusal to disavow enforcement against the plaintiff. *Online Merchs.*, 995 F.3d at 550. These factors are not mechanical, nor do they all have to be satisfied. *See id.*

Only one of these factors meaningfully demonstrates a credible threat of prosecution: the history of enforcement. As Mr. Cameron admits, his office has a history of enforcing CIDs like the ones at issue here. [R. 7 at 20.] After this lawsuit was filed, Mr. Cameron issued two more CIDs to Vanguard and State Street. [R. 13 at 12; R. 13-2; R. 13-3.] That said, none of the CIDs that the Attorney General's office is currently pursuing target the Plaintiffs or their members. Nor do the Plaintiffs point to any historical CIDs that targeted them. This factor tips somewhat in the Plaintiffs' favor.

The remaining factors do not. The Plaintiffs point to press conferences that Mr. Cameron conducted as analogs to warning letters. [R. 13 at 12.] The analogy is thin, at best. The Sixth Circuit has found this factor satisfied where the Government sent the plaintiff a letter alleging

13

that his proposed speech violates a law or regulation. *See Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014). The Circuit has also found a plaintiff to have standing to challenge subpoenas and CIDs that did not specifically allege an ongoing violation of law where the documents were directed to the plaintiff and part of an investigation into him. *See Online Merchs.*, 995 F.3d at 550–51. Both cases showed a connection between the warning document and the plaintiff.

      Here, Mr. Cameron's press conferences make no discernible reference to the Plaintiffs. Mr. Cameron issued a press release stating that "[w]e joined this investigation to ensure Kentucky companies that reject the Biden Administration's anti-fossil fuel climate agenda have the same financial freedoms as those who accept it." [R. 13 at 12.] Mr. Cameron allegedly later made a statement hostile to "making net zero commitments."[8] *Id.* Neither of these press releases identifies the Plaintiffs or targets their members for future investigation. These general remarks, unrelated to the Plaintiffs in this case, are not analogous to a warning letter.

      Under the next factor, the Plaintiffs have shown nothing in the consumer protection or antitrust statutes that makes enforcement easy. A statute can be easier to enforce if it includes a private right of action, meaning that the general public could enforce it against the plaintiff. *See id.* at 551; *Fischer v. Thomas*, 52 F.4th 303, 308–09 (6th Cir. 2022). But the Bankers Association and Hope do not complain that any member of the public might enforce Kentucky's consumer protection laws or antitrust laws against them. Instead, they complain about the ease with which Mr. Cameron could potentially enforce these statutes. [*See* R. 13 at 12.] It is unclear to the Court why Kentucky's attorney general's authority to enforce these statutes would make

---

[8] Perplexingly, the Court cannot glean the context of this statement. The Plaintiffs claim that Mr. Cameron "wrote that 'making net zero commitments' was a decision he had been challenging." [R. 13 at 12.] Unfortunately, the exhibit that the Plaintiffs provided the Court is only legible to the following extent: "The attorneys general wrote, 'By making net zero commitments, Vanguard nec . . . .'" [R. 13-4 at 1.] A watermark cuts off the remaining text. *Id.*

them exceptional. If anything, it makes them typical. *C.f. Fischer*, 52 F.4th at 308 (finding enforcement of the statute was easier where "a provision authoriz[ed] any member of the public to file complaints.").

Finally, the fact that Mr. Cameron has not disavowed enforcing the statutes does not indicate a likelihood of enforcement in this case. A refusal to disavow enforcement, combined with other factors, weighs "in favor of finding a credible threat of prosecution." *Id.* at 309. That combination typically entails a refusal to disavow enforcement after the Government has threatened some form of enforcement against the plaintiff's desired speech. *See Susan B. Anthony List*, 573 U.S. at 165 (finding failure to disavow contributed to a likelihood of enforcement where "the owner of the billboard refused to display SBA's message after receiving a letter threatening Commission proceedings.").

Here, Mr. Cameron has never indicated that he might enforce Kentucky's consumer protection statutes against the Plaintiffs. So why is it unusual that he has not disavowed enforcing them in the future? Do the Bankers Association and Hope expect law enforcement to disavow enforcement of all statutes against every member of the public? If Mr. Cameron has not investigated the Bankers Association and Hope, how would he know whether they potentially violated the statutes? Given the present circumstances, the Court sees nothing nefarious behind Mr. Cameron's refusal to disavow enforcement.

On balance, the factors do not indicate a credible threat that Mr. Cameron will enforce Kentucky's consumer protection and antitrust laws against the Bankers Association and Hope. Absent that showing, they cannot bring a pre-enforcement challenge on behalf their members. *Online Merchs.*, 995 F.3d at 549. Under this theory, the Bankers Association and Hope lack standing.

**3**

In a last attempt to demonstrate a cognizable injury, Hope argues that it has direct standing because Mr. Cameron's investigation will diminish its access to funding. [R. 13 at 14.] Recall that Hope pools money from sixty financial institutions to fund multifamily housing projects. [R. 1-1 at 1–2.] It argues that the "methods of producing energy" that contractors and suppliers use throughout the supply chain affect its ability to develop these projects. [R. 13 at 14.] Therefore, it wishes to discuss green energy investing "with the multiple lenders who pool funds to finance the multifamily housing projects" without fear of Mr. Cameron's CIDs. *Id.*

This argument is remarkably unencumbered by the need to cite to authority. And for good reason. Standing requires an injury that is both "concrete and particularized" not "conjectural or hypothetical." *Spokeo, Inc.*, 578 U.S. at 339. Hope's lending injury is neither.

Hope has not pointed to any decrease in the availability of funding for its projects. Rather, it merely speculates that financing its projects may become more difficult. [*See* R. 13 at 14.] As the party who bears the burden of demonstrating standing, Hope must do more. *See Lujan*, 504 U.S. at 561. A legally cognizable injury is not speculative. *See Spokeo, Inc.*, 578 U.S. at 339. Moreover, Hope's concerns that future discussions about green energy lending will lead to CIDs does little more than demonstrate subjective chill, which is "not an adequate substitute of specific present objective harm or a threat of future harm." *Morrison*, 521 F.3d at 609. This final attempt to demonstrate standing also fails.

**C**

So, having determined that the Plaintiffs lack standing to assert their First Amendment claim, where does that leave matters? The remaining two claims arise purely from Kentucky law. [*See* R. 1-1 at 8, 11.] Mr. Cameron urges the Court to trudge on and consider whether the

Plaintiffs have standing to assert these claims. [*See* R. 16 at 8–11.] Meanwhile, the Plaintiffs argue that, in the absence of their one federal claim, the Court lacks subject matter jurisdiction over the state law disputes. [R. 13 at 21.]

The Plaintiffs are correct. "If the court dismisses plaintiff's federal claims pursuant to Rule 12(b)(1), then supplemental jurisdiction can *never* exist." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996). Under supplemental jurisdiction, Article III only permits federal courts to hear state claims if they are so related to a federal claim that "the entire action before the court comprises but one constitutional 'case.'" *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). But "the federal claim must have substance sufficient to confer subject matter jurisdiction on the court." *Id.* If a court dismisses a federal claim under Rule 12(b)(1), it determines that "there never was a valid federal claim." *Musson Theatrical*, 89 F.3d at 1255. In that event, the exercise of supplemental jurisdiction would reach beyond the scope of Article III. *Id.* Nothing remains for the Court to do but remand this matter to state court.

### III

The Bankers Association and Hope raise academically interesting issues regarding Attorney General Cameron's investigation. They believe that the CIDs discriminate on the basis of content and discourage political discourse on an evolving issue. [*See* R. 13 at 23.] Unfortunately, federal courts do not issue advisory opinions. *Norvell v. Sangre de Cristo Dev. Co.*, 519 F.2d 370, 375 (10th Cir. 1975). Academic interest does not render a case ripe for adjudication or create a case or controversy. *Id.* Without jurisdiction, the Court must decline to go further. Accordingly, for these reasons, it is hereby **ORDERED** as follows:

1. Defendant Daniel Cameron's Motion to Dismiss **[R. 7]** is **GRANTED IN PART** and **DENIED IN PART**;

2. Count 2 of the Complaint is **DISMISSED** without prejudice;

3. This case is **REMANDED** to Franklin Circuit Court;

4. All pending motions in this matter are **DENIED** as moot; and

5. This case is **STRICKEN** from the Court's active docket.

This the 28th day of September 2023.

Gregory F. Van Tatenhove
United States District Judge